(Slip Opinion)            OCTOBER TERM, 2011            1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHRISTOPHER ET AL. *v*. SMITHKLINE BEECHAM CORP., DBA GLAXOSMITHKLINE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–204.   Argued April 16, 2012—Decided June 18, 2012

The Fair Labor Standards Act (FLSA) requires employers to pay em-
ployees overtime wages, see 29 U. S. C. §207(a), but this requirement
does not apply with respect to workers employed "in the capacity of
outside salesman," §213(a)(1).  Congress did not elaborate on the
meaning of "outside salesman," but it delegated authority to the De-
partment of Labor (DOL) to issue regulations to define the term.
Three of the DOL's regulations are relevant to this case.  First, 29
CFR §541.500 defines "outside salesman" to mean "any employee . . .
[w]hose primary duty is . . . making sales within the meaning of [29
U. S. C. §203(k)]."  §§541.500(a)(1)–(2).  Section 203(k), in turn, states
that " '[s]ale' or 'sell' includes any sale, exchange, contract to sell,
consignment for sale, shipment for sale, or other disposition."  Se-
cond, §541.501 clarifies that "[s]ales within the meaning of [§203(k)]
include the transfer of title to tangible property."  §541.501(b).  Third,
§541.503 provides that promotion work that is "performed incidental
to and in conjunction with an employee's own outside sales or solici-
tations is exempt work," whereas promotion work that is "incidental
to sales made, or to be made, by someone else is not."  §541.503(a).
The DOL provided additional guidance in connection with its prom-
ulgation of these regulations, stressing that an employee is an "out-
side salesman" when the employee "in some sense, has made sales."
69 Fed. Reg. 22162.

   The prescription drug industry is subject to extensive federal regu-
lation, including the requirement that prescription drugs be dis-
pensed only upon a physician's prescription.  In light of this require-
ment, pharmaceutical companies have long focused their direct
marketing efforts on physicians.  Pharmaceutical companies promote

their products to physicians through a process called "detailing," whereby employees known as "detailers" or "pharmaceutical sales representatives" try to persuade physicians to write prescriptions for the products in appropriate cases.

Petitioners were employed by respondent as pharmaceutical sales representatives for roughly four years, and during that time their primary objective was to obtain a nonbinding commitment from physicians to prescribe respondent's products in appropriate cases. Each week, petitioners spent about 40 hours in the field calling on physicians during normal business hours and an additional 10 to 20 hours attending events and performing other miscellaneous tasks. Petitioners were not required to punch a clock or report their hours, and they were subject to only minimal supervision. Petitioners were well compensated for their efforts, and their gross pay included both a base salary and incentive pay. The amount of incentive pay was determined based on the performance of petitioners' assigned portfolio of drugs in their assigned sales territories. It is undisputed that petitioners were not paid time-and-a-half wages when they worked more than 40 hours per week.

Petitioners filed suit, alleging that respondent violated the FLSA by failing to compensate them for overtime. Respondent moved for summary judgment, arguing that petitioners were "employed in the capacity of outside salesman," §213(a)(1), and therefore were exempt from the FLSA's overtime compensation requirement. The District Court agreed and granted summary judgment to respondent. Petitioners filed a motion to alter or amend the judgment, contending that the District Court had erred in failing to accord controlling deference to the DOL's interpretation of the pertinent regulations, which the DOL had announced in an *amicus* brief filed in a similar action. The District Court rejected this argument and denied the motion. The Ninth Circuit, agreeing that the DOL's interpretation was not entitled to controlling deference, affirmed.

*Held:* Petitioners qualify as outside salesmen under the most reasonable interpretation of the DOL's regulations. Pp. 8–25.

(a) The DOL filed *amicus* briefs in the Second Circuit and the Ninth Circuit in which it took the view that "a 'sale' for the purposes of the outside sales exemption requires a consummated transaction directly involving the employee for whom the exemption is sought." Brief for Secretary of Labor as *Amicus Curiae* in *In re Novartis Wage and Hour Litigation*, No. 09–0437 (CA2), p. 11. The DOL changed course after the Court granted certiorari in this case, however, and now maintains that "[a]n employee does not make a 'sale' . . . unless he actually transfers title to the property at issue." Brief for United States as *Amicus Curiae* 12–13. The DOL's current interpretation of

its regulations is not entitled to deference under *Auer* v. *Robbins*, 519 U. S. 452. Although *Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, see, *id.*, at 461–462, this general rule does not apply in all cases. Deference is inappropriate, for example, when the agency's interpretation is " 'plainly erroneous or inconsistent with the regulation,' " *id.*, at 461, or when there is reason to suspect that the interpretation "does not reflect the agency's fair and considered judgment on the matter," *id.,* at 462. There are strong reasons for withholding *Auer* deference in this case. Petitioners invoke the DOL's interpretation to impose potentially massive liability on respondent for conduct that occurred well before the interpretation was announced. To defer to the DOL's interpretation would result in precisely the kind of "unfair surprise" against which this Court has long warned. See, *e.g., Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 170–171. Until 2009, the pharmaceutical industry had little reason to suspect that its longstanding practice of treating detailers as exempt outside salesmen transgressed the FLSA. The statute and regulations do not provide clear notice. Even more important, despite the industry's decades-long practice, the DOL never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully. The only plausible explanation for the DOL's inaction is acquiescence. Whatever the general merits of *Auer* deference, it is unwarranted here. The DOL's interpretation should instead be given a measure of deference proportional to its power to persuade. See *United States* v. *Mead Corp.*, 533 U. S. 218, 228. Pp. 8–14.

(b) The DOL's current interpretation—that a sale demands a transfer of title—is quite unpersuasive. It plainly lacks the hallmarks of thorough consideration. Because the DOL first announced its view that pharmaceutical sales representatives are not outside salesmen in a series of *amicus* briefs, there was no opportunity for public comment, and the interpretation that initially emerged from the DOL's internal decisionmaking process proved to be untenable. The interpretation is also flatly inconsistent with the FLSA. The statute defines "sale" to mean, *inter alia*, a "consignment for sale," and a "consignment for sale" does not involve the transfer of title. The DOL relies heavily on 29 CFR §541.501, which provides that "[s]ales . . . include the transfer of title to tangible property," §541.501(b), but it is apparent that this regulation does not mean that a sale must include a transfer of title, only that transactions involving a transfer of title are included within the term "sale." The DOL's "explanation that obtaining a non-binding commitment to prescribe a drug constitutes promotion, and not sales," Reply Brief for Petitioners 17, is also

unconvincing.  Since promotion work that is performed incidental to
an employee's own sales is exempt, the DOL's conclusion that detail-
ers perform only nonexempt promotion work is only as strong as the
reasoning underlying its conclusion that those employees do not
make sales.  Pp. 14–16.

(c) Because the DOL's interpretation is neither entitled to *Auer*
deference nor persuasive in its own right, traditional tools of inter-
pretation must be employed to determine whether petitioners are ex-
empt outside salesmen.  Pp. 16–24.

(1) The FLSA does not furnish a clear answer to this question,
but it provides at least one interpretive clue by exempting anyone
"employed . . . in the capacity of [an] outside salesman."  29 U. S. C.
§213(a)(1).  The statute's emphasis on "capacity" counsels in favor of
a functional, rather than a formal, inquiry, one that views an em-
ployee's responsibilities in the context of the particular industry in
which the employee works.  The DOL's regulations provide additional
guidance.  Section 541.500 defines an outside salesman as an em-
ployee whose primary duty is "making sales" and adopts the statu-
tory definition of "sale."  This statutory definition contains at least
three important textual clues.  First, the definition is introduced with
the verb "includes," which indicates that the examples enumerated
in the text are illustrative, not exhaustive.  See *Burgess* v. *United
States*, 553 U. S. 124, 131, n. 3.  Second, the list of transactions in-
cluded in the statutory definition is modified by "any," which, in the
context of §203(k), is best read to mean " 'one or some indiscriminate-
ly of whatever kind,' " *United States* v. *Gonzales*, 520 U. S. 1, 5.
Third, the definition includes the broad catchall phrase "other dispo-
sition."  Under the rule of *ejusdem generis,* the catchall phrase is
most reasonably interpreted as including those arrangements that
are tantamount, in a particular industry, to a paradigmatic sale of a
commodity.  Nothing in the remaining regulations requires a narrow-
er construction.  Pp. 16–20.

(2) Given this interpretation of "other disposition," it follows that
petitioners made sales under the FLSA and thus are exempt outside
salesmen within the meaning of the DOL's regulations.  Petitioners
obtain nonbinding commitments from physicians to prescribe re-
spondent's drugs.  This kind of arrangement, in the unique regula-
tory environment within which pharmaceutical companies operate,
comfortably falls within the catchall category of "other disposition."
That petitioners bear all of the external indicia of salesmen provides
further support for this conclusion.  And this holding also comports
with the apparent purpose of the FLSA's exemption.  The exemption
is premised on the belief that exempt employees normally earn sala-
ries well above the minimum wage and perform a kind of work that is

Syllabus

difficult to standardize to a particular time frame and that cannot easily be spread to other workers. Petitioners—each of whom earned an average of more than $70,000 per year and spent 10 to 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory—are hardly the kind of employees that the FLSA was intended to protect. Pp. 20–22.

    (3) Petitioners' remaining arguments are also unavailing. Pp. 22–24.

635 F. 3d 383, affirmed.

    ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–204

MICHAEL SHANE CHRISTOPHER, ET AL., PETITION-
ERS *v.* SMITHKLINE BEECHAM CORPORATION
DBA GLAXOSMITHKLINE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 18, 2012]

JUSTICE ALITO delivered the opinion of the Court.

The Fair Labor Standards Act (FLSA) imposes minimum wage and maximum hours requirements on employers, see 29 U. S. C. §§206–207 (2006 ed. and Supp. IV), but those requirements do not apply to workers employed "in the capacity of outside salesman," §213(a)(1).  This case requires us to decide whether the term "outside salesman," as defined by Department of Labor (DOL or Department) regulations, encompasses pharmaceutical sales representatives whose primary duty is to obtain nonbinding commitments from physicians to prescribe their employer's prescription drugs in appropriate cases.  We conclude that these employees qualify as "outside salesm[e]n."

I

A

Congress enacted the FLSA in 1938 with the goal of "protect[ing] all covered workers from substandard wages and oppressive working hours." *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 739 (1981); see also 29 U. S. C. §202(a).  Among other requirements, the

FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1½ times the employees' regular wages. See §207(a). The overtime compensation requirement, however, does not apply with respect to all employees. See §213. As relevant here, the statute exempts workers "employed . . . in the capacity of outside salesman." §213(a)(1).[1]

Congress did not define the term "outside salesman," but it delegated authority to the DOL to issue regulations "from time to time" to "defin[e] and delimi[t]" the term. *Ibid.* The DOL promulgated such regulations in 1938, 1940, and 1949. In 2004, following notice-and-comment procedures, the DOL reissued the regulations with minor amendments. See 69 Fed. Reg. 22122 (2004). The current regulations are nearly identical in substance to the regulations issued in the years immediately following the FLSA's enactment. See 29 CFR §§541.500–541.504 (2011).

Three of the DOL's regulations are directly relevant to this case: §§541.500, 541.501, and 541.503. We refer to these three regulations as the "general regulation," the "sales regulation," and the "promotion-work regulation," respectively.

The general regulation sets out the definition of the statutory term "employee employed in the capacity of outside salesman." It defines the term to mean "any employee . . . [w]hose primary duty is . . . making sales within the meaning of [29 U. S. C. §203(k)]"[2] and "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary

_____

[1] This provision also exempts workers "employed in a bona fide executive, administrative, or professional capacity." 29 U. S. C. §213(a)(1).

[2] The definition also includes any employee "[w]hose primary duty is . . . obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." 29 CFR §541.500(a)(1)(ii). That portion of the definition is not at issue in this case.

duty."[3] §§541.500(a)(1)–(2). The referenced statutory provision, 29 U. S. C. §203(k), states that "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Thus, under the general regulation, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

The sales regulation restates the statutory definition of sale discussed above and clarifies that "[s]ales within the meaning of [29 U. S. C. §203(k)] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." 29 CFR §541.501(b).

Finally, the promotion-work regulation identifies "[p]romotion work" as "one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed." §541.503(a). Promotion work that is "performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work," whereas promotion work that is "incidental to sales made, or to be made, by someone else is not exempt outside sales work." *Ibid.*

Additional guidance concerning the scope of the outside salesman exemption can be gleaned from reports issued in connection with the DOL's promulgation of regulations in 1940 and 1949, and from the preamble to the 2004 regulations. See Dept. of Labor, Wage and Hour Division, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (1940) (hereinafter 1940 Report); Dept. of Labor, Wage and Hour Division,

---

[3] It is undisputed that petitioners were "customarily and regularly engaged away" from respondent's place of business in performing their responsibilities.

Report and Recommendations on Proposed Revisions of Regulations, Part 541 (1949) (hereinafter 1949 Report); 69 Fed. Reg. 22160–22163 (hereinafter Preamble).  Although the DOL has rejected proposals to eliminate or dilute the requirement that outside salesmen make their own sales, the Department has stressed that this requirement is met whenever an employee "in some sense make[s] a sale." 1940 Report 46; see also Preamble 22162 (reiterating that the exemption applies only to an employee who "in some sense, has made sales").  And the DOL has made it clear that "[e]xempt status should not depend" on technicalities, such as "whether it is the sales employee or the customer who types the order into a computer system and hits the return button," Preamble 22163, or whether "the order is filled by [a] jobber rather than directly by [the employee's] own employer," 1949 Report 83.

B

Respondent SmithKline Beecham Corporation is in the business of developing, manufacturing, and selling prescription drugs.  The prescription drug industry is subject to extensive federal regulation, including the now-familiar requirement that prescription drugs be dispensed only upon a physician's prescription.[4]  In light of this require-

_____

[4] Congress imposed this requirement in 1951 when it amended the Federal Food, Drug, and Cosmetic Act (FDCA) to provide that drugs that are "not safe for use except under the supervision of a practitioner" may be dispensed "only . . . upon a . . . prescription of a practitioner licensed by law to administer such drug."  Durham-Humphrey Amendment of 1951, ch. 578, 65 Stat. 648–649 (codified at 21 U. S. C. §353(b)). As originally enacted in 1938, the FDCA allowed manufacturers to designate certain drugs as prescription only, but "it did not say which drugs were to be sold by prescription or that there were any drugs that could not be sold without a prescription."  Temin, The Origin of Compulsory Drug Prescriptions, 22 J. Law & Econ. 91, 98 (1979).  Prior to Congress' enactment of the FDCA, a prescription was not needed to obtain any drug other than  certain narcotics.  See *id.,* at 97.

ment, pharmaceutical companies have long focused their direct marketing efforts, not on the retail pharmacies that dispense prescription drugs, but rather on the medical practitioners who possess the authority to prescribe the drugs in the first place. Pharmaceutical companies promote their prescription drugs to physicians through a process called "detailing," whereby employees known as "detailers" or "pharmaceutical sales representatives" provide information to physicians about the company's products in hopes of persuading them to write prescriptions for the products in appropriate cases. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 1–2) (describing the process of "detailing"). The position of "detailer" has existed in the pharmaceutical industry in substantially its current form since at least the 1950's, and in recent years the industry has employed more than 90,000 detailers nationwide. See 635 F. 3d 383, 387, and n. 5, 396 (CA9 2011).

Respondent hired petitioners Michael Christopher and Frank Buchanan as pharmaceutical sales representatives in 2003. During the roughly four years when petitioners were employed in that capacity,[5] they were responsible for calling on physicians in an assigned sales territory to discuss the features, benefits, and risks of an assigned portfolio of respondent's prescription drugs. Petitioners' primary objective was to obtain a nonbinding commitment[6] from the physician to prescribe those drugs in appropriate cases, and the training that petitioners received underscored the importance of that objective.

Petitioners spent about 40 hours each week in the field calling on physicians. These visits occurred during normal

---

[5] Respondent terminated Christopher's employment in 2007, and Buchanan left voluntarily the same year to accept a similar position with another pharmaceutical company.

[6] The parties agree that the commitment is nonbinding.

business hours, from about 8:30 a.m. to 5 p.m. Outside of normal business hours, petitioners spent an additional 10 to 20 hours each week attending events, reviewing product information, returning phone calls, responding to e-mails, and performing other miscellaneous tasks. Petitioners were not required to punch a clock or report their hours, and they were subject to only minimal supervision.

Petitioners were well compensated for their efforts. On average, Christopher's annual gross pay was just over $72,000, and Buchanan's was just over $76,000.[7] Petitioners' gross pay included both a base salary and incentive pay. The amount of petitioners' incentive pay was based on the sales volume or market share of their assigned drugs in their assigned sales territories,[8] and this amount was uncapped. Christopher's incentive pay exceeded 30 percent of his gross pay during each of his years of employment; Buchanan's exceeded 25 percent. It is undisputed that respondent did not pay petitioners time-and-a-half wages when they worked in excess of 40 hours per week.

C

Petitioners brought this action in the United States District Court for the District of Arizona under 29 U. S. C. §216(b). Petitioners alleged that respondent violated the FLSA by failing to compensate them for overtime, and they sought both backpay and liquidated damages as relief. Respondent moved for summary judgment, arguing that petitioners were "employed . . . in the capacity of

---

[7] The median pay for pharmaceutical detailers nationwide exceeds $90,000 per year. See Brief for Respondent 14.

[8] The amount of incentive pay is not formally tied to the number of prescriptions written or commitments obtained, but because retail pharmacies are prohibited from dispensing prescription drugs without a physician's prescription, retail sales of respondent's products necessarily reflect the number of prescriptions written.

outside salesman," §213(a)(1), and therefore were exempt from the FLSA's overtime compensation requirement.[9] The District Court agreed and granted summary judgment to respondent. See App. to Pet. for Cert. 37a–47a.

After the District Court issued its order, petitioners filed a motion to alter or amend the judgment, contending that the District Court had erred in failing to accord controlling deference to the DOL's interpretation of the pertinent regulations. That interpretation had been announced in an uninvited *amicus* brief filed by the DOL in a similar action then pending in the Second Circuit. See Brief for Secretary of Labor as *Amicus Curiae* in *In re Novartis Wage and Hour Litigation*, No. 09–0437 (hereinafter Secretary's *Novartis* Brief). The District Court rejected this argument and denied the motion. See App. to Pet. for Cert. 48a–52a.

The Court of Appeals for the Ninth Circuit affirmed. See 635 F. 3d 383. The Court of Appeals agreed that the DOL's interpretation[10] was not entitled to controlling deference. See *id.,* at 393–395. It held that, because the commitment that petitioners obtained from physicians was the maximum possible under the rules applicable to the pharmaceutical industry, petitioners made sales within the meaning of the regulations. See *id.,* at 395–397. The court found it significant, moreover, that the DOL had previously interpreted the regulations as requiring only that an employee "'in some sense'" make a sale, see *id.,* at 395–396 (emphasis deleted), and had "acquiesce[d] in the sales practices of the drug industry for over seventy

_____

[9] Respondent also argued that petitioners were exempt administrative employees. The District Court and the Court of Appeals found it unnecessary to reach that argument, and the question is not before us.

[10] The DOL filed an *amicus* brief in the Ninth Circuit advancing substantially the same interpretation it had advanced in its brief in the Second Circuit. See Brief for Secretary of Labor as *Amicus Curiae* in No. 10–15257.

years," *id.,* at 399.

The Ninth Circuit's decision conflicts with the Second Circuit's decision in *In re Novartis Wage and Hour Litigation*, 611 F. 3d 141, 153–155 (2010) (holding that the DOL's interpretation is entitled to controlling deference). We granted certiorari to resolve this split, 565 U. S. ___ (2011), and we now affirm the judgment of the Ninth Circuit.

## II

We must determine whether pharmaceutical detailers are outside salesmen as the DOL has defined that term in its regulations. The parties agree that the regulations themselves were validly promulgated and are therefore entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). But the parties disagree sharply about whether the DOL's interpretation of the regulations is owed deference under *Auer* v. *Robbins*, 519 U. S. 452 (1997). It is to that question that we now turn.

## A

The DOL first announced its view that pharmaceutical detailers are not exempt outside salesmen in an *amicus* brief filed in the Second Circuit in 2009, and the Department has subsequently filed similar *amicus* briefs in other cases, including the case now before us.[11] While the DOL's ultimate conclusion that detailers are not exempt has remained unchanged since 2009, the same cannot be said of its reasoning. In both the Second Circuit and the Ninth

---

[11] The DOL invites "interested parties to inform it of private cases involving the misclassification of employees in contravention of the new Part 541 rule" so that it may file *amicus* briefs "in appropriate cases to share with courts the Department's view of the proper application of the new Part 541 rule." See Dept. of Labor, Office of Solicitor, Overtime Security *Amicus* Program, http://www.dol.gov/sol/541amicus.htm (as visited June 15, 2012, and available in Clerk of Court's case file).

Circuit, the DOL took the view that "a 'sale' for the pur-
poses of the outside sales exemption requires a con-
summated transaction directly involving the employee for
whom the exemption is sought." Secretary's *Novartis*
Brief 11; see also Brief for Secretary of Labor as *Amicus
Curiae* in No. 10–15257 (CA9), p. 12. Perhaps because
of the nebulous nature of this "consummated transaction"
test,[12] the Department changed course after we granted
certiorari in this case. The Department now takes the
position that "[a]n employee does not make a 'sale' for
purposes of the 'outside salesman' exemption unless he
actually transfers title to the property at issue." Brief for
United States as *Amicus Curiae* 12–13 (hereinafter U. S.
Brief).[13] Petitioners and the DOL assert that this new
interpretation of the regulations is entitled to controlling
deference. See Brief for Petitioners 31–42; U. S. Brief
30–34.[14]

---

[12] For example, it is unclear why a physician's nonbinding commit-
ment to prescribe a drug in an appropriate case cannot qualify as a sale
under this test. The broad term "transaction" easily encompasses such
a commitment. See Webster's Third New International Dictionary
2425 (2002) (hereinafter Webster's Third) (defining "transaction" to
mean "a communicative action or activity involving two parties or two
things reciprocally affecting or influencing each other"). A "consum-
mated transaction" is simply a transaction that has been fully completed.
See *id.*, at 490 (defining "consummate" to mean "to bring to comple-
tion"). And a pharmaceutical sales representative who obtains such a
commitment is "directly involv[ed]" in this transaction. Thus, once a
pharmaceutical sales representative and a physician have fully com-
pleted their agreement, it may be said that they have entered into a
"consummated transaction."

[13] When pressed to clarify its position at oral argument, the DOL
suggested that a "transfer of possession in contemplation of a transfer
of title" might also suffice. Tr. of Oral Arg. 17.

[14] Neither petitioners nor the DOL asks us to accord controlling def-
erence to the "consummated transaction" interpretation the Depart-
ment advanced in its briefs in the Second Circuit and Ninth Circuit, nor
could we given that the Department has now abandoned that interpre-
tation. See *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 480

Although *Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, see *Chase Bank USA, N. A.* v. *McCoy*, 562 U. S. ___, ___ (2011) (slip op., at 12); *Auer*, 519 U. S., at 461–462, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" *Id.*, at 461 (quoting *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 359 (1989)). And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, *supra,* at 462; see also, *e.g., Chase Bank*, *supra*, at ___ (slip op., at 14). This might occur when the agency's interpretation conflicts with a prior interpretation, see, *e.g., Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 515 (1994), or when it appears that the interpretation is nothing more than a "convenient litigating position," *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 213 (1988), or a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," *Auer*, *supra*, at 462 (quoting *Bowen*, *supra*, at 212; alteration in original).

In this case, there are strong reasons for withholding the deference that *Auer* generally requires. Petitioners invoke the DOL's interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced. To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties "fair warn-

_____

(1992) (noting that "it would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself").

ing of the conduct [a regulation] prohibits or requires."
*Gates & Fox Co.* v. *Occupational Safety and Health Review
Comm'n*, 790 F. 2d 154, 156 (CADC 1986) (Scalia, J.).[15]
Indeed, it would result in precisely the kind of "unfair
surprise" against which our cases have long warned. See
*Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S.
158, 170–171 (2007) (deferring to new interpretation that
"create[d] no unfair surprise" because agency had pro-
ceeded through notice-and-comment rulemaking); *Martin* v.
*Occupational Safety and Health Review Comm'n*, 499 U. S.
144, 158 (1991) (identifying "adequacy of notice to regu-
lated parties" as one factor relevant to the reasonableness
of the agency's interpretation); *NLRB* v. *Bell Aerospace Co.*,
416 U. S. 267, 295 (1974) (suggesting that an agency
should not change an interpretation in an adjudicative
proceeding where doing so would impose "new liability . . .
on individuals for past actions which were taken in good-

———————

[15] Accord, *Phelps Dodge Corp.* v. *Federal Mine Safety and Health
Review Comm'n*, 681 F. 2d 1189, 1192 (CA9 1982) (recognizing that "the
application of a regulation in a particular situation may be challenged
on the ground that it does not give fair warning that the allegedly
violative conduct was prohibited"); *Kropp Forge Co.* v. *Secretary of
Labor*, 657 F. 2d 119, 122 (CA7 1981) (refusing to impose sanctions
where standard the regulated party allegedly violated "d[id] not provide
'fair warning' of what is required or prohibited"); *Dravo Corp.* v. *Occu-
pational Safety and Health Review Comm'n*, 613 F. 2d 1227, 1232–1233
(CA3 1980) (rejecting agency's expansive interpretation where agency
did not "state with ascertainable certainty what is meant by the stand-
ards [it] ha[d] promulgated" (internal quotation marks omitted and
emphasis deleted)); *Diamond Roofing Co.* v. *Occupational Safety and
Health Review Comm'n*, 528 F. 2d 645, 649 (CA5 1976) (explaining that
"statutes and regulations which allow monetary penalties against those
who violate them" must "give an employer fair warning of the conduct
[they] prohibi[t] or requir[e]"); 1 R. Pierce, Administrative Law Treatise
§6.11, p. 543 (5th ed. 2010) (observing that "[i]n penalty cases, courts
will not accord substantial deference to an agency's interpretation of
an ambiguous rule in circumstances where the rule did not place the
individual or firm on notice that the conduct at issue constituted a
violation of a rule").

faith reliance on [agency] pronouncements" or in a case involving "fines or damages").

This case well illustrates the point. Until 2009, the pharmaceutical industry had little reason to suspect that its longstanding practice of treating detailers as exempt outside salesmen transgressed the FLSA. The statute and regulations certainly do not provide clear notice of this. The general regulation adopts the broad statutory definition of "sale," and that definition, in turn, employs the broad catchall phrase "other disposition." See 29 CFR §541.500(a)(1). This catchall phrase could reasonably be construed to encompass a nonbinding commitment from a physician to prescribe a particular drug, and nothing in the statutory or regulatory text or the DOL's prior guidance plainly requires a contrary reading. See Preamble 22162 (explaining that an employee must "in some sense" make a sale); 1940 Report 46 (same).

Even more important, despite the industry's decades-long practice of classifying pharmaceutical detailers as exempt employees, the DOL never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully.[16] We acknowledge that an agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred. See, *e.g., Heckler* v. *Chaney*, 470 U. S. 821, 831 (1985) (noting that "an agency decision not

––––––––––––

[16] It appears that the DOL only once directly opined on the exempt status of detailers prior to 2009. In 1945, the Wage and Hour Division issued an opinion letter tentatively concluding that "medical detailists" who performed "work . . . aimed at increasing the use of [their employer's] product in hospitals and through physicians' recommendations" qualified as administrative employees. Opinion Letter from Dept. of Labor, Wage and Hour Division (May 19, 1945), 1 CCH Labor Law Service, Federal Wage-Hour Guide ¶33,093. But that letter did not address the outside salesman exemption.

to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise"). But where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute. As the Seventh Circuit has noted, while it may be "possible for an entire industry to be in violation of the [FLSA] for a long time without the Labor Department noticing," the "more plausible hypothesis" is that the Department did not think the industry's practice was unlawful. *Yi* v. *Sterling Collision Centers, Inc.*, 480 F. 3d 505, 510–511 (2007). There are now approximately 90,000 pharmaceutical sales representatives; the nature of their work has not materially changed for decades and is well known; these employees are well paid; and like quintessential outside salesmen, they do not punch a clock and often work more than 40 hours per week. Other than acquiescence, no explanation for the DOL's inaction is plausible.

Our practice of deferring to an agency's interpretation of its own ambiguous regulations undoubtedly has important advantages,[17] but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby "frustrat[ing] the notice and predictability purposes of rulemaking." *Talk America, Inc.* v. *Michigan Bell Telephone Co.*, 564 U. S. ___, ___ (2011) (SCALIA, J., concurring) (slip op., at 3); see also Stephenson & Pogoriler, *Seminole Rock*'s Domain, 79 Geo. Wash. L. Rev. 1449, 1461–1462 (2011); Manning, Constitutional Structure and

---

[17] For instance, it "makes the job of a reviewing court much easier, and since it usually produces affirmance of the agency's view without conflict in the Circuits, it imparts (once the agency has spoken to clarify the regulation) certainty and predictability to the administrative process." *Talk America, Inc.* v. *Michigan Bell Telephone Co.*, 564 U. S. ___, ___ (2011) (SCALIA, J., concurring) (slip op., at 3).

Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612, 655–668 (1996). It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

Accordingly, whatever the general merits of *Auer* deference, it is unwarranted here. We instead accord the Department's interpretation a measure of deference proportional to the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *United States* v. *Mead Corp.*, 533 U. S. 218, 228 (2001) (quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)).

B

We find the DOL's interpretation of its regulations quite unpersuasive. The interpretation to which we are now asked to defer—that a sale demands a transfer of title—plainly lacks the hallmarks of thorough consideration. Because the DOL first announced its view that pharmaceutical sales representatives do not qualify as outside salesmen in a series of *amicus* briefs, there was no opportunity for public comment, and the interpretation that initially emerged from the Department's internal decisionmaking process proved to be untenable. After arguing successfully in the Second Circuit and then unsucessfully in the Ninth Circuit that a sale for present purposes simply requires a "consummated transaction," the DOL advanced a different interpretation in this Court. Here, the DOL's brief states unequivocally that "[a]n employee does not make a 'sale' for purposes of the 'outside salesman'

exemption unless he actually transfers title to the property at issue." U. S. Brief 12–13.

This new interpretation is flatly inconsistent with the FLSA, which defines "sale" to mean, *inter alia*, a "consignment for sale." A "consignment for sale" does not involve the transfer of title. See, *e.g., Sturm* v. *Boker*, 150 U. S. 312, 330 (1893) ("The agency to sell and return the proceeds, or the specific goods if not sold . . . does not involve a change of title"); Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Com. L. J. 146, 147 (1962) (explaining that "'[a] consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed'" (quoting *Rio Grande Oil Co.* v. *Miller Rubber Co. of N. Y.*, 31 Ariz. 84, 87, 250 P. 564, 565 (1926))).

The DOL cannot salvage its interpretation by arguing that a "consignment for sale" may *eventually* result in the transfer of title (from the consignor to the ultimate purchaser if the consignee in fact sells the good). Much the same may be said about a physician's nonbinding commitment to prescribe a particular product in an appropriate case. In that situation, too, agreement may eventually result in the transfer of title (from the manufacturer to a pharmacy and ultimately to the patient for whom the drug is prescribed).

In support of its new interpretation, the DOL relies heavily on its sales regulation, which states in part that "[s]ales [for present purposes] *include* the transfer of title to tangible property," 29 CFR §541.501(b) (emphasis added). This regulation, however, provides little support for the DOL's position. The DOL reads the sales regulation to mean that a "sale" *necessarily* includes the transfer of title, but that is not what the regulation says. And it seems clear that that is not what the regulation means. The sentence just subsequent to the one on which the DOL relies, echoing the terms of the FLSA, makes clear that a

"consignment for sale" qualifies as a sale. Since a con-
signment for sale does not involve a transfer of title, it is
apparent that the sales regulation does not mean that a
sale must include a transfer of title, only that transactions
involving a transfer of title are included within the term
"sale."

Petitioners invite us to look past the DOL's "determina-
tion that a sale must involve the transfer of title" and
instead defer to the Department's "explanation that ob-
taining a non-binding commitment to prescribe a drug
constitutes promotion, and not sales." Reply Brief for
Petitioners 17. The problem with the DOL's interpreta-
tion of the promotion-work regulation, however, is that it
depends almost entirely on the DOL's flawed transfer-of-
title interpretation. The promotion-work regulation does
not distinguish between promotion work and sales; rather,
it distinguishes between exempt promotion work and
nonexempt promotion work. Since promotion work that is
performed incidental to an employee's own sales is ex-
empt, the DOL's conclusion that pharmaceutical detailers
perform only nonexempt promotion work is only as strong
as the reasoning underlying its conclusion that those
employees do not make sales. For the reasons already
discussed, we find this reasoning wholly unpersuasive.

In light of our conclusion that the DOL's interpretation
is neither entitled to *Auer* deference nor persuasive in its
own right, we must employ traditional tools of interpreta-
tion to determine whether petitioners are exempt outside
salesmen.

C

1

We begin with the text of the FLSA. Although the
provision that establishes the overtime salesman exemp-
tion does not furnish a clear answer to the question before
us, it provides at least one interpretive clue: It exempts

anyone "employed . . . *in the capacity* of [an] outside salesman." 29 U. S. C. §213(a)(1) (emphasis added). "Capacity," used in this sense, means "[o]utward condition or circumstances; relation; character; position." Webster's New International Dictionary 396 (2d ed. 1934); see also 2 Oxford English Dictionary 89 (def. 9) (1933) ("Position, condition, character, relation"). The statute's emphasis on the "capacity" of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works.

The DOL's regulations provide additional guidance. The general regulation defines an outside salesman as an employee whose primary duty is "making sales," and it adopts the statutory definition of "sale." 29 CFR §541.500(a)(1)(i). This definition contains at least three important textual clues. First, the definition is introduced with the verb "includes" instead of "means." This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive. See *Burgess* v. *United States*, 553 U. S. 124, 131, n. 3 (2008) (explaining that "[a] term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning . . . than where . . . the definition declares what a term 'means'" (alteration in original; some internal quotation marks omitted)). Indeed, Congress used the narrower word "means" in other provisions of the FLSA when it wanted to cabin a definition to a specific list of enumerated items. See, *e.g.,* 29 U. S. C. §203(a) ("'Person' *means* an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons" (emphasis added)).

Second, the list of transactions included in the statutory definition of sale is modified by the word "any." We have recognized that the modifier "any" can mean "different things depending upon the setting," *Nixon* v. *Missouri*

*Municipal League*, 541 U. S. 125, 132 (2004), but in the context of 29 U. S. C. §203(k), it is best read to mean "'one or some indiscriminately of whatever kind,'" *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). That is so because Congress defined "sale" to include both the unmodified word "sale" and transactions that might not be considered sales in a technical sense, including exchanges and consignments for sale.[18]

Third, Congress also included a broad catchall phrase: "other disposition." Neither the statute nor the regulations define "disposition," but dictionary definitions of the term range from "relinquishment or alienation" to "arrangement." See Webster's New International Dictionary 644 (def. 1(b)) (1927) ("[t]he getting rid, or making over, of anything; relinquishment or alienation"); *ibid.* (def. 1(a)) ("[t]he ordering, regulating, or administering of anything"); 3 Oxford English Dictionary, *supra*, at 493 (def. 4) ("[t]he action of disposing of, putting away, getting rid of, making over, etc."); *ibid.* (def. 1) ("[t]he action of setting in order, or condition of being set in order; arrangement, order"). We agree with the DOL that the rule of *ejusdem generis* should guide our interpretation of the catchall phrase, since it follows a list of specific items.[19] But the limit the DOL posits, one that would confine the phrase to dispositions involving "contract[s] for the exchange of goods or services in return for value," see U. S. Brief 20, is

--------

[18] Given that the FLSA provides its own definition of "sale" that is more expansive than the term's ordinary meaning, the DOL's reliance on dictionary definitions of the word "sale" is misplaced. See, *e.g.*, *Burgess* v. *United States*, 553 U. S. 124, 130 (2008) (noting that "[w]hen a statute includes an explicit definition, we must follow that definition" (internal quotation marks omitted)).

[19] The canon of *ejusdem generis* "limits general terms [that] follow specific ones to matters similar to those specified." *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 562 U. S. ___, ___ (2011) (slip op., at 16) (alteration in original; internal quotation marks omitted).

much too narrow, as is petitioners' view that a sale re-
quires a "firm agreement" or "firm commitment" to buy,
see Tr. of Oral Arg. 64, 66. These interpretations would
defeat Congress' intent to define "sale" in a broad manner
and render the general statutory language meaningless.
See *United States* v. *Alpers*, 338 U. S. 680, 682 (1950)
(instructing that rule of *ejusdem generis* cannot be em-
ployed to "obscure and defeat the intent and purpose of
Congress" or "render general words meaningless"). In-
deed, we are hard pressed to think of any contract for the
exchange of goods or services in return for value or any
firm agreement to buy that would not also fall within one
of the specifically enumerated categories.[20]

The specific list of transactions that precedes the phrase
"other disposition" seems to us to represent an attempt to
accommodate industry-by-industry variations in methods
of selling commodities. Consequently, we think that the
catchall phrase "other disposition" is most reasonably in-
terpreted as including those arrangements that are tan-
tamount, in a particular industry, to a paradigmatic sale
of a commodity.

Nothing in the remaining regulations requires a nar-
rower construction.[21] As discussed above, the sales regu-

——————

[20] The dissent's approach suffers from the same flaw. The dissent
contends that, in order to make a sale, an employee must at least
obtain a "firm commitment to buy." *Post*, at 10 (opinion of BREYER, J.).
But when an employee who has extended an offer to sell obtains a "firm
commitment to buy," that transaction amounts to a "contract to sell."
Given that a "contract to sell" already falls within the statutory defini-
tion of "sale," the dissent's interpretation would strip the catchall
phrase of independent meaning.

[21] In the past, we have stated that exemptions to the FLSA must be
"narrowly construed against the employers seeking to assert them and
their application limited to those [cases] plainly and unmistakably
within their terms and spirit." *Arnold* v. *Ben Kanowsky, Inc.*, 361 U. S.
388, 392 (1960). Petitioners and the DOL contend that *Arnold* requires
us to construe the outside salesman exemption narrowly, but *Arnold* is

lation instructs that sales within the meaning of 29 U. S. C. §203(k) "*include* the transfer of title to tangible property," 29 CFR §541.501(b) (emphasis added), but this regulation in no way limits the broad statutory definition of "sale." And although the promotion-work regulation distinguishes between promotion work that is incidental to an employee's own sales and work that is incidental to sales made by someone else, see §541.503(a), this distinction tells us nothing about the meaning of "sale."[22]

2

Given our interpretation of "other disposition," it follows that petitioners made sales for purposes of the FLSA and therefore are exempt outside salesmen within the meaning of the DOL's regulations. Obtaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that re-

―――――――

inapposite where, as here, we are interpreting a general definition that applies throughout the FLSA.

[22] The dissent's view that pharmaceutical detailers are more naturally characterized as nonexempt promotional employees than as exempt outside salesmen relies heavily on the DOL's explanation in its 1940 Report that "sales promotion men" are not salesmen. See *post,* at 7; see also 1940 Report 46. There, the Department described a "sales promotion man" as an employee who merely "pav[es] the way for salesmen" and who frequently "deals with retailers who are not customers of his own employer but of his employer's customer" and is "interested in sales *by* the retailer, not *to* the retailer." 1940 Report 46. The dissent asserts that detailers are analogous to "sales promotion men" because they deal with "individuals, namely doctors, 'who are not customers' of their own employer" and "are primarily interested in sales *authorized by* the doctor, not *to* the doctor." *Post,* at 7. But this comparison is inapt. The equivalent of a "sales promotion man" in the pharmaceutical industry would be an employee who promotes a manufacturer's products to the retail pharmacies that sell the products after purchasing them from a wholesaler or distributor. Detailers, by contrast, obtain nonbinding commitments from the gatekeepers who must prescribe the product if any sale is to take place at all.

spondent sells.[23]  This kind of arrangement, in the unique regulatory environment within which pharmaceutical companies must operate, comfortably falls within the catch-all category of "other disposition."

That petitioners bear all of the external indicia of salesmen provides further support for our conclusion. Petitioners were hired for their sales experience.  They were trained to close each sales call by obtaining the maximum commitment possible from the physician.  They worked away from the office, with minimal supervision, and they were rewarded for their efforts with incentive compensation.  It would be anomalous to require respondent to compensate petitioners for overtime, while at the same time exempting employees who function identically to petitioners in every respect except that they sell physician-administered drugs, such as vaccines and other injectable pharmaceuticals, that are ordered by the physician directly rather than purchased by the end user at a pharmacy with a prescription from the physician.

Our holding also comports with the apparent purpose of the FLSA's exemption for outside salesmen.  The exemption is premised on the belief that exempt employees "typically earned salaries well above the minimum wage" and enjoyed other benefits that "se[t] them apart from the nonexempt workers entitled to overtime pay."  Preamble 22124.  It was also thought that exempt employees performed a kind of work that "was difficult to standardize to

———————

[23] Our point is not, as the dissent suggests, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman.  See *post,* at 9 (noting that "the 'most' a California firm's marketing employee may be able 'to do' to secure orders from New York customers is to post an advertisement on the Internet").  Rather, our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.

any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium." *Ibid.* Petitioners—each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory— are hardly the kind of employees that the FLSA was intended to protect. And it would be challenging, to say the least, for pharmaceutical companies to compensate detailers for overtime going forward without significantly changing the nature of that position. See, *e.g.,* Brief for PhRMA as *Amicus Curiae* 14–20 (explaining that "key aspects of [detailers'] jobs as they are currently structured are fundamentally incompatible with treating [detailers] as hourly employees").

3

The remaining arguments advanced by petitioners and the dissent are unavailing. Petitioners contend that detailers are more naturally classified as nonexempt promotional employees who merely stimulate sales made by others than as exempt outside salesmen. They point out that respondent's prescription drugs are not actually sold until distributors and retail pharmacies order the drugs from other employees. See Reply Brief for Petitioners 7. Those employees,[24] they reason, are the true salesmen in

_____

[24] According to one of respondent's *amici*, most pharmaceutical companies "have systems in place to maintain the inventories of wholesalers and retailers of prescription drugs (consisting mainly of periodic restocking pursuant to a general contract), [and] these systems are largely ministerial and require only a few employees to administer them." Brief for PhRMA as *Amicus Curiae* 24; see also *ibid.* (explaining that one of its members employs more than 2,000 pharmaceutical sales

the industry, not detailers. This formalistic argument is inconsistent with the realistic approach that the outside salesman exemption is meant to reflect.

Petitioners' theory seems to be that an employee is properly classified as a nonexempt promotional employee whenever there is another employee who actually makes the sale in a technical sense. But, taken to its extreme, petitioners' theory would require that we treat as a nonexempt promotional employee a manufacturer's representative who takes an order from a retailer but then transfers the order to a jobber's employee to be filled, or a car salesman who receives a commitment to buy but then asks his or her assistant to enter the order into the computer. This formalistic approach would be difficult to reconcile with the broad language of the regulations and the statutory definition of "sale," and it is in significant tension with the DOL's past practice. See 1949 Report 83 (explaining that the manufacturer's representative was clearly "performing sales work regardless of the fact that the order is filled by the jobber rather than directly by his own employer"); Preamble 22162 (noting that "technological changes in how orders are taken and processed should not preclude the exemption for employees who in some sense make the sales").

Petitioners additionally argue that detailers are the functional equivalent of employees who sell a "concept," and they point to Wage and Hour Division opinion letters, as well as lower court decisions, deeming such employees nonexempt. See Brief for Petitioners 47–48. Two of these opinions, however, concerned employees who were more analogous to buyers than to sellers. See *Clements* v. *Serco, Inc.*, 530 F. 3d 1224, 1229–1230, n. 4 (CA10 2008) (ex-

_____

representatives but "fewer than ten employees who are responsible for processing orders from retailers and wholesalers, a ratio that is typical of how the industry is structured").

plaining that, although military recruiters "[i]n a loose sense" were "selling the Army's services," it was the Army that would "pa[y] for the services of the recruits who enlist"); Opinion Letter from Dept. of Labor, Wage and Hour Division (Aug. 19, 1994), 1994 WL 1004855 (explaining that selling the "concept" of organ donation "is similar to that of outside buyers who in a very loose sense are sometimes described as selling their employer's 'service' to the person for whom they obtain their goods"). And the other two opinions are likewise inapposite. One concerned employees who were not selling a good or service at all, see Opinion Letter from Dept. of Labor, Wage and Hour Division (May 22, 2006), 2006 WL 1698305 (concluding that employees who solicit charitable contributions are not exempt), and the other concerned employees who were incapable of selling any good or service because their employer had yet to extend an offer, see Opinion Letter from Dept. of Labor, Wage and Hour Division (Apr. 20, 1999), 1999 WL 1002391 (concluding that college recruiters are not exempt because they merely induce qualified customers to apply to the college, and the college "in turn decides whether to make a contractual offer of its educational services to the applicant").

Finally, the dissent posits that the "primary duty" of a pharmaceutical detailer is not "to obtain a promise to prescribe a particular drug," but rather to "provid[e] information so that the doctor will keep the drug in mind with an eye toward using it when appropriate." *Post,* at 6. But the record in this case belies that contention. Petitioners' end goal was not merely to make physicians aware of the medically appropriate uses of a particular drug. Rather, it was to convince physicians actually to prescribe the drug in appropriate cases. See App. to Pet. for Cert. 40a (finding that petitioners' "primary objective was convincing physicians to prescribe [respondent's] products to their patients").

Opinion of the Court

\*     \*     \*

For these reasons, we conclude that petitioners qualify as outside salesmen under the most reasonable interpretation of the DOL's regulations. The judgment of the Court of Appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–204

_____

## MICHAEL SHANE CHRISTOPHER, ET AL., PETITION-ERS *v.* SMITHKLINE BEECHAM CORPORATION DBA GLAXOSMITHKLINE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2012]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUS-TICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The Fair Labor Standards Act (FLSA) exempts from federal maximum hour and minimum wage requirements "any employee employed . . . in the capacity of outside salesman." 29 U. S. C. §213(a)(1). The question is whether drug company detailers fall within the scope of the term "outside salesman." In my view, they do not.

I

The Court describes the essential aspects of the detail-er's job as follows: First, the detailer "provide[s] infor-mation to physicians about the company's products in hopes of persuading them to write prescriptions for the products in appropriate cases." *Ante,* at 5. Second, the detailers "cal[l] on physicians in an assigned sales terri-tory to discuss the features, benefits, and risks of an as-signed portfolio of respondent's prescription drugs," and they seek a "nonbinding commitment from the physician to prescribe those drugs in appropriate cases . . . . " *Ibid.* (footnote omitted). Third, the detailers' compensation includes an "incentive" element "based on the sales volume or market share of their assigned drugs in their assigned sales territories." *Ante,* at 6. The Court adds that the

detailers work with "only minimal supervision" and beyond normal business hours "attending events, reviewing product information, returning phone calls, responding to e-mails, and performing other miscellaneous tasks." *Ante,* at 6.

As summarized, I agree with the Court's description of the job. In light of important, near-contemporaneous differences in the Justice Department's views as to the meaning of relevant Labor Department regulations, see *ante,* at 8–9, I also agree that we should not give the Solicitor General's current interpretive view any especially favorable weight. *Ante,* at 14. Thus, I am willing to assume, with the Court, that we should determine whether the statutory term covers the detailer's job as here described through our independent examination of the statute's language and the related Labor Department regulations. But, I conclude on that basis that a detailer is not an "outside salesman."

## II

The FLSA does not itself define the term "outside salesman." Rather, it exempts from wage and hour requirements "any employee employed . . . in the capacity of outside salesman (*as such terms are defined and delimited from time to time by regulations of the Secretary*)." 29 U. S. C. §213(a)(1) (emphasis added). Thus, we must look to relevant Labor Department regulations to answer the question. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984); see also *Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 165 (2007) (explaining that "the FLSA explicitly leaves gaps" to be filled by regulations).

There are three relevant regulations. The first is entitled "General rule for outside sales employees," 29 CFR §541.500 (2011); the second is entitled "Making sales or obtaining orders," §541.501; and the third is entitled

"Promotion work," §541.503. The relevant language of the first two regulations is similar. The first says that the term "'employee employed in the capacity of outside salesman' . . . shall mean any employee . . . [w]hose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities . . . ." §541.500(a)(1). The second regulation tells us that the first regulation "requires that the employee be engaged in . . . (1) Making sales within the meaning of section 3(k) of the Act, or (2) Obtaining orders or contracts for services or for the use of facilities." §541.501(a).

The second part of these quoted passages is irrelevant here, for it concerns matters not at issue, namely "orders or contracts for *services* or for the *use of facilities.*" The remaining parts of the two regulations are similarly irrelevant. See Appendix, *infra*. Thus, the relevant portions of the first two regulations say simply that the employee's "primary duty" must be "making sales within the meaning of section 3(k) of the Act." And §3(k) of the Act says that the word "'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U. S. C. §203(k).

Unless we give the words of the statute and regulations some special meaning, a detailer's primary duty is not that of "making sales" or the equivalent. A detailer might convince a doctor to prescribe a drug for a particular kind of patient. If the doctor encounters such a patient, he might prescribe the drug. The doctor's client, the patient, might take the prescription to a pharmacist and ask the pharmacist to fill the prescription. If so, the pharmacist might sell the manufacturer's drug to the patient, or might substitute a generic version. But it is the pharmacist, not the detailer, who will have sold the drug.

To put the same fairly obvious point in the language of the regulations and of §3(k) of the FLSA, see 29 U. S. C.

§203(k), the detailer does not "sell" anything to the doctor. See Black's Law Dictionary 1454 (9th ed. 2009) (defining "sale" as "[t]he transfer of property or title for a price"). Nor does he, during the course of that visit or immediately thereafter, "exchange" the manufacturer's product for money or for anything else. He enters into no "contract to sell" on behalf of anyone. He "consigns" nothing "for sale." He "ships" nothing for sale. He does not "dispose" of any product at all.

What the detailer does is inform the doctor about the nature of the manufacturer's drugs and explain their uses, their virtues, their drawbacks, and their limitations. The detailer may well try to convince the doctor to prescribe the manufacturer's drugs for patients. And if the detailer is successful, the doctor will make a "nonbinding commitment" to write prescriptions using one or more of those drugs where appropriate. If followed, that "nonbinding commitment" is, at most, a nonbinding promise to consider advising a patient to use a drug where medical indications so indicate (if the doctor encounters such a patient), and to write a prescription that will likely (but may not) lead that person to order that drug under its brand name from the pharmacy. (I say "may not" because 30% of patients in a 2-year period have not filled a prescription given to them by a doctor. See USA Today, Kaiser Family Foundation, Harvard School of Public Health, The Public on Prescription Drugs and Pharmaceutical Companies 3 (2008), available at http://www.kff.org/kaiserpolls/upload/7748.pdf (all Internet materials as visited June 13, 2012, and available in Clerk of Court's case file). And when patients do fill prescriptions, 75% are filled with generic drugs. See Dept. of Health and Human Services, Office of Science & Data Policy, Expanding the Use of Generic Drugs 2 (2010).)

Where in this process does the detailer *sell* the product? At most he obtains from the doctor a "nonbinding com-

mitment" to advise his patient to take the drug (or per-
haps a generic equivalent) as well as to write any neces-
sary prescription. I put to the side the fact that neither
the Court nor the record explains exactly what a "nonbind-
ing commitment" is. Like a "definite maybe," an "impos-
sible solution," or a "theoretical experience," a "nonbinding
commitment" seems to claim more than it can deliver.
Regardless, other than in colloquial speech, to obtain a
commitment to *advise* a client to buy a product is not to
obtain a commitment to *sell* that product, no matter how
often the client takes the advice (or the patient does what
the doctor recommends).

The third regulation, entitled "Promotion work," lends
support to this view. That is because the detailer's work
as described above is best viewed as promotion work. The
regulation makes clear that promotion work falls within
the statutory exemption only when the promotion work "is
actually performed incidental to and in conjunction with
*an employee's own outside sales* or solicitations." 29 CFR
§541.503(a) (emphasis added). But it is not exempt if it is
"incidental to sales made, or to be made, by someone else."
*Ibid.*

The detailer's work, in my view, is more naturally char-
acterized as involving "[p]romotional activities designed to
stimulate sales . . . made by someone else," §541.503, *e.g.,*
the pharmacist or the wholesaler, than as involving
"[p]romotional activities designed to stimulate" the detail-
er's "*own* sales."

Three other relevant documents support this reading.
First, the Pharmaceutical Research and Manufacturers
of America (PhRMA), of which respondent is a mem-
ber, publishes a "Code on Interactions with Healthcare Pro-
fessionals." See PhRMA, Code on Interactions with
Healthcare Professionals (PhRMA Code) (rev. July 2008),
available at http://www.phrma.org/sites/default/files/108/
phrma_marketing_code_2008.pdf. The PhRMA Code de-

scribes a detailer's job in some depth. It consistently refers to detailers as "delivering accurate, up-to-date information to healthcare professionals," *id.,* at 14, and it stresses the importance of a doctor's treatment decision being based "solely on each patient's medical needs" and the doctor's "medical knowledge and experience," *id.,* at 2. The PhRMA Code also forbids the offering or providing of anything "in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices." *Id.,* at 13. But the PhRMA Code nowhere refers to detailers as if they were salesmen, rather than providers of information, nor does it refer to any kind of commitment.

To the contrary, the document makes clear that the pharmaceutical industry itself understands that it cannot be a detailer's "primary duty" to obtain a nonbinding commitment, for, in respect to many doctors, such a commitment taken alone is unlikely to make a significant difference to their doctor's use of a particular drug. When a particular drug, say Drug D, constitutes the best treatment for a particular patient, a knowledgeable doctor should (hence likely will) prescribe it *irrespective of any nonbinding commitment* to do so. Where some other drug, however, is likely to prove more beneficial for a particular patient, that doctor should *not* (hence likely will not) prescribe Drug D *irrespective of any nonbinding commitment* to the contrary.

At a minimum, the document explains why a detailer should not (hence likely does not) see himself as seeking *primarily* to obtain a promise to prescribe a particular drug, as opposed to providing information so that the doctor will keep the drug in mind with an eye toward using it when appropriate. And because the detailer's "primary duty" is informational, as opposed to sales-oriented, he fails to qualify as an outside salesman. See §541.500(a)(1)(i) (restricting the outside salesman exemp-

tion to employees "[w]hose *primary duty* is . . . making sales" (emphasis added)). A detailer operating in accord with the PhRMA Code "sells" the product only in the way advertisers (particularly very low key advertisers) "sell" a product: by creating demand for the product, not by taking orders.

Second, a Labor Department Wage and Hour Division Report written in 1940 further describes the work of "sales promotion men." See Dept. of Labor, Wage and Hour Division, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (1940) (1940 Report). The 1940 Report says that such individuals "pav[e] the way" for sales by others. *Id.,* at 46. "Frequently," they deal "with [the] retailers who are not customers of [their] own employer but of [their] employer's customer." *Ibid.* And they are "primarily interested in sales *by* the retailer, not *to* the retailer." *Ibid.* "[T]hey do not make actual sales," and they "are admittedly not outside salesmen." *Ibid.*

Like the "sales promotion men," the detailers before us deal with individuals, namely doctors, "who are not customers" of their own employer. And the detailers are primarily interested in sales *authorized by* the doctor, not *to* the doctor. According to the 1940 Report, sales promotion men are not "outside salesmen," primarily because they seek to bring about, not their own sales, but sales by others. Thus, the detailers in this case are not "outside salesmen."

Third, a Wage and Hour Division Report written in 1949 notes that where "work is promotional in nature it is sometimes difficult to determine whether it is incidental to the employee's own sales work." See Dept. of Labor, Wage and Hour Division, Report and Recommendations on Proposed Revisions of Regulations, Part 541, p. 82 (1949) (1949 Report). It adds that in borderline cases

> "the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, *at least to the extent of obtaining a commitment to buy from the person to whom he is selling.* If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt." *Id.,* at 83 (emphasis added).

The 1949 Report also refers to a

> "company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock . . . , consults with the manager as to the requirements of the store, fills out a requisition for the quantity wanted and leaves it with the store manager to be transmitted to the central warehouse of the chain-store company which later ships the quantity requested." *Id.,* at 84.

It says this company representative is *not* an "outside salesman" because he

> "does not consummate the sale nor direct his efforts toward the consummation of a sale (the store manager often has no authority to buy)." *Ibid.*

See also 29 CFR §541.503(c) (explaining that if an employee "does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work")

A detailer does not take orders, he does not consummate a sale, and he does not direct his efforts towards the consummation of any eventual sale (by the pharmacist) any more than does the "company's representative" in the 1949 Report's example. The doctor whom the detailer visits, like the example's store manager, "has no authority to buy."

Taken together, the statute, regulations, ethical codes,

and Labor Department Reports indicate that the drug detailers do not promote their "own sales," but rather "sales made, or to be made, by someone else." Therefore, detailers are not "outside salesmen."

## III

The Court's different conclusion rests primarily upon its interpretation of the statutory words "other disposition" as "including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Ante,* at 19. Given the fact that the doctor buys nothing, the fact that the detailer sells nothing to the doctor, and the fact that any "nonbinding commitment" by the doctor must, of ethical necessity, be of secondary importance, there is nothing about the detailer's visit with the doctor that makes the visit (or what occurs during the visit) "tantamount . . . to a paradigmatic sale." *Ibid.* See Part I, *supra.*

The Court adds that "[o]btaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that respondent sells." *Ante,* at 20. And that may be so. But there is no "most they are able to do" test. After all, the "most" a California firm's marketing employee may be able "to do" to secure orders from New York customers is to post an advertisement on the Internet, but that fact does not help qualify the posting employee as a "salesman." The Court adds that it means to apply this test only when the law precludes "an entire industry . . . from selling its products in the ordinary manner." *Ante,* at 21, n. 23. But the law might preclude an industry from selling its products through an outside salesman without thereby leading the legal term "outside salesman" to apply to whatever is the next best thing. In any event, the Court would be wrong to assume, if it does assume, that there is in nearly every

industry an outside salesman lurking somewhere (if only we can find him). An industry might, after all, sell its goods through wholesalers or retailers, while using its own outside employees to encourage sales only by providing third parties with critically important information.

The Court expresses concern lest a holding that detailers are not "salesmen" lead to holdings that the statute forbids treating as a "salesman" an employee "who takes an order from a retailer but then transfers the order to a jobber's employee to be filled," *ante,* at 23, or "a car salesman who receives a commitment to buy but then asks his or her assistant to enter the order into the computer," *ibid.* But there is no need for any such fear. Both these examples involve employees who are salesmen because they obtain a firm commitment to buy the product. See 1949 Report 83 (as to the first example, such an employee "has obtained a commitment from the customer"); 69 Fed. Reg. 22163 (2004) (as to the second example, explaining that "[e]xempt status should not depend on . . . who types the order into a computer," but maintaining requirement that a salesman "obtai[n] a commitment to buy from the person to whom he is selling"). The problem facing the detailer is that he does not obtain any such commitment.

Finally, the Court points to the detailers' relatively high pay, their uncertain hours, the location of their work, their independence, and the fact that they frequently work overtime, all as showing that detailers fall within the basic purposes of the statutory provision that creates exceptions from wage and hour requirements. *Ante,* at 5–6. The problem for the detailers, however, is that the statute seeks to achieve its general objectives by creating certain categories of exempt employees, one of which is the category of "outside salesman." It places into that category only those who satisfy the definition of "outside salesman" as *defined and delimited from time to time by regulations of the Secretary*." 29 U. S. C. §213(a)(1) (emphasis

added).  And the detailers do not fall within that category as defined by those regulations.

For these reasons, with respect, I dissent.

APPENDIX

1. 29 CFR §541.500 (2011) provides:

**"General rule for outside sales employees.**

"(a) The term 'employee employed in the capacity of outside salesman' in section 13(a)(1) of the Act shall mean any employee:

"(1)Whose primary duty is:

"(i) making sales within the meaning of section 3(k) of the Act, or

"(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

"(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

"(b) The term 'primary duty' is defined at §541.700. In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

"(c) The requirements of subpart G (salary requirements) of this part do not apply to the outside sales employees described in this section."

2. 29 CFR §541.501 (2011) provides:

**"Making sales or obtaining orders.**

"(a) Section 541.500 requires that the employee be engaged in:

"(1) Making sales within the meaning of section

3(k) of the Act, or

"(2) Obtaining orders or contracts for services or for the use of facilities.

"(b) Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that 'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

"(c) Exempt outside sales work includes not only the sales of commodities, but also 'obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer.' Obtaining orders for 'the use of facilities' includes the selling of time on radio or television, the solicitation of advertising for newspapers and other periodicals, and the solicitation of freight for railroads and other transportation agencies.

"(d) The word 'services' extends the outside sales exemption to employees who sell or take orders for a service, which may be performed for the customer by someone other than the person taking the order."

3. 29 CFR §541.503 (2011) provides:

**"Promotion work.**

"(a) Promotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt

outside sales work. An employee who does not satisfy the requirements of this subpart may still qualify as an exempt employee under other subparts of this rule. "(b) A manufacturer's representative, for example, may perform various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. Such an employee can be considered an exempt outside sales employee if the employee's primary duty is making sales or contracts. Promotion activities directed toward consummation of the employee's own sales are exempt. Promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work.

"(c) Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work."