**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHERON GEORGE; SHARRICCI
FOURTE-DANCY,
        *Plaintiffs-Appellees,*

        v.

BAY AREA RAPID TRANSIT,
        *Defendant-Appellant.*

No. 07-15661

D.C. No.
CV-00-02206-CW

SHERON GEORGE; SHARRICCI
FOURTE-DANCY,
        *Plaintiffs-Appellees,*

UNITED STATES OF AMERICA,
        *Appellant,*

        v.

BAY AREA RAPID TRANSIT,
        *Defendant.*

No. 07-15896

D.C. No.
CV-00-02206-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued September 11, 2008
Submitted August 5, 2009
San Francisco, California

Filed August 13, 2009

Before: Diarmuid F. O'Scannlain, Ronald M. Gould and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

10923

**COUNSEL**

Patricia Barbosa, Law Offices of Paul L. Rein, Oakland, California argued the cause for plaintiffs-appellees and filed a brief. Paul Rein and Julie Ostel, Law Offices of Paul L. Rein, Oakland, California, and Bryce Anderson, Law Office of Bryce Anderson, Brentwood, California were on the brief.

Joseph Hearst, Berkeley, California argued the cause for Bay Area Rapid Transit and filed briefs. Clement Glynn and James Hanlon, Glynn & Finley LLP, Walnut Creek, California were on the briefs.

Karl Gellert, U.S. Department of Justice, Washington, D.C., argued the cause for intervenor-appellant and filed the briefs.

Rena Comisac, Acting Assistant Attorney General, and Mark Gross were on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether sight-impaired transit riders can recover under the Americans with Disabilities Act where a public transit service system complies with existing federal design regulations for train station accessibility.

I

A

1

Sheron George had congenital cataracts. By 1998, her vision had become impaired to the point that she was declared legally blind.[1] George valued her independence, and because she could not drive, relied on services provided by Bay Area Rapid Transit District ("BART") and other public transportation services to get around. She found it particularly difficult to negotiate stairs because of her limited depth perception. However, she was able to use stairs if they were painted or marked a different color to show the location of each step. She was taught to follow the movement of others to avoid getting lost when she entered or exited public places. She had never attempted to use BART's so-called accessible or universal routes in its train stations.

One day, George was walking from a bus to a BART train station when she fell down a set of stairs. She reported that

---

[1]George has since died; her personal representative is continuing this case.

she "did not see any markings or any other indication that [she] was approaching a stair until [she] suddenly stepped off into thin air." She also noted that she was in great pain as a result of her fall and was taken to the hospital the next day. Four days later, George fell again when she attempted to use what was (unbeknownst to her) a closed entrance. She stated in an affidavit that she was severely hurt and asked BART to call an ambulance.

George's eyesight improved in 2001 to the point that she was no longer legally blind. However, she reported that after her falls she developed physical disabilities that significantly impaired her mobility and was prescribed a wheelchair due to those disabilities.

2

Sharricci Fourte-Dancy[2] had partial sight in both eyes, with corrected vision of 20/200 in one eye and 20/100 in the other.[3] Her depth perception and peripheral vision were limited; her night vision was even more significantly impaired. As of 2002, she was a student at California State University at Hayward and used public transportation (including BART) to attend school and for other purposes. She reported anxiety when using some of BART's stations because they were not equipped with color contrast striping or accessible handrails. She did not have the visual acuity necessary to locate a designated accessible route on her own because she could not read signs in public places unless she was very close to them. Fourte-Dancy reported feeling unsafe when isolated from the general public, and stated that the BART elevators she knew of were too isolated. For these two reasons, she "would not and [could not] use the 'universal route' that BART claims

[2]Fourte-Dancy's name is spelled differently in some district court documents. We use the spelling used by her counsel in this case.

[3]The facts recited were true as of April 25, 2002. We are unaware of Fourte-Dancy's current status.

was intended and designed for blind and low vision persons." She reported, however, that she could use facilities "with a few minor modifications," such as color contrast striping and accessible handrails.

Fourte-Dancy reported that the lack of color contrast striping and the excessively wide handrails almost caused her to fall at BART's MacArthur train station. She also reported that the glare from the color contrast steps at the 19th Street station also caused her difficulty in using the stairs.

B

George and Fourte-Dancy (to whom we refer as "transit riders") sued BART in the United States District Court for the Northern District of California, alleging violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and California civil rights laws.[4]

In the district court, both sides agreed that BART's facilities complied with the Department of Transportation ("DOT") regulations, which require that each light rail station have "at least one accessible route from an accessible entrance to those areas necessary for the use of the transportation system." 56 Fed. Reg. 45,500, 45,510 (Sept. 6, 1991). DOT regulations are required by statute to be consistent with the ADA Accessibility Guidelines ("ADAAG") in effect at the time. Such specific technical guidelines implementing the ADA are issued by the Architectural and Transportation Barriers Compliance Board ("Board"), an independent agency.[5] Nevertheless, the

---

[4]Four of BART's stations must meet certain requirements imposed by the ADA. After the passage of the ADA, each of these stations was modified to provide a route for individuals with disabilities. The transit riders claim that the routes do not meet the needs of visually disabled persons.

[5]The Board has thirteen members appointed by the President from the general public (of whom at least seven must be persons with disabilities) and a representative from each of twelve federal agencies. 29 U.S.C.

district court found that such DOT regulations were "both arbitrary and plainly contrary to the statute." Because "the ADA requires that public transportation programs be accessible to all patrons with disabilities," "[t]he DOT regulations are arbitrary and capricious to the extent that they fail to fulfill this mandate by failing to address the needs of those with visual impairments." A stipulated judgment required BART to pay attorney's fees and costs, as well as $35,000 in compensatory damages. In addition, BART was required to take seven specific steps to improve the accessibility of some of its facilities to those with vision impairments.

BART appealed the district court's decision to this court, whereupon the United States was granted leave to file a brief as amicus curiae. On April 21, 2006, we vacated the district court's decision and remanded the case to the district court so the United States could intervene as a party, which the United States promptly did. *See George v. Bay Area Rapid Transit Dist.*, 175 F. App'x 809 (9th Cir. 2006). Following remand, the district court again found the DOT regulations to be arbi-

---

§ 792. Congress directed the Board to publish minimum accessibility guidelines. 42 U.S.C. § 12204. The Department of Transportation was required to make its regulations "consistent" with those guidelines. 42 U.S.C. § 12149(b). In 1991, the Board issued the ADAAG after receiving over 400 comments, including comments about individuals with visual disabilities. For instance, the Board received comments about the use of large characters on signs, design criteria for use in aiding those with visual disabilities, and other matters. 56 Fed. Reg. 45,500, 45,503 (Sept. 6, 1991).

DOT then issued its ADA regulations. DOT's regulations are consistent with the Board's guidelines. 49 C.F.R § 37.9 ("[A] transportation facility shall be considered to be readily accessible to and usable by individuals with disabilities if it meets the requirements of this part and the requirements set forth in Appendices B and D to 36 CFR part 1191 [i.e., the ADAAG requirements], which apply to buildings and facilities covered by the Americans with Disabilities Act, as modified by Appendix A to this part.").

trary and capricious. BART and the United States both now timely appeal.

## II

The United States argues that the district court erred by declaring the DOT regulatory scheme arbitrary and capricious.[6]

## A

DOT was required to issue regulations to make "key stations" readily accessible to and useable by persons with visual impairments. *See* 42 U.S.C. § 12147(b)(1); id. §§ 12134(a), 12143, 12149, 12164. The United States argues that DOT has, in fact, done so. We agree; the DOT regulations are not arbitrary or capricious because the DOT did address the needs of those with visual disabilities, although perhaps not to the level the transit riders would have preferred.

DOT regulations address these needs, in part, through a performance standard. The Board had explicitly included in ADAAG a provision requiring facilities to be designed to minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public. The performance standard addresses "persons who cannot negotiate steps," and the Board enacted the performance standard to aid the visually disabled. *See* 56

---

[6]In their response brief, the transit riders suggest that *Chevron* deference is not appropriate because the statutory language is clear. We disagree. The statutory command for DOT to issue regulations is fatal to the transit riders' suggestion, since administrative rulemaking inherently involves addressing specifics not addressed in the underlying legislation. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute.").

Fed. Reg. 45,500, 45,504 (Sept. 6, 1991) ("The [preliminary rules] required designers to lay out stations in a straightforward manner, both to reduce the distance a person with a disability would need to travel and to encourage consistency in design to assist all persons, but *especially* persons with cognitive, *visual* or stamina-limiting disabilities *to locate* various elements expeditiously." (emphases added)). Earlier, the Board considered whether "steps should have contrasting nosings or thread markings" but concluded that it was "not aware of any research that" supported such a recommendation. 56 Fed. Reg. 35,408, 35,432 (July 26, 1991). Consistent with the Board's decisions, DOT included the performance standard in its regulations, but did not require contrasting nosings or thread markings.

Furthermore, the DOT regulations require many other features to aid those with visual disabilities. For instance, signs used to indicate the direction of the accessible route must use a wheelchair icon and meet certain typeface requirements. *Id.* at 45,510. Certain steps to minimize glare are required, *id.*, and tactile warnings must be placed near platform edges. *Id.* at 45,508.[7]

The transit riders counter that "readily accessible to and usable by" means "a high degree of convenient accessibility." H.R. 101-485(III), 1990 U.S.C.C.A.N. 445, 483 (1990). However, they merely replace one vague phrase with another, doing little to aid us in deciding whether DOT's regulations are arbitrary and capricious.

**[1]** "A decision is arbitrary and capricious if the agency [1] has relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that

---

[7]Requirements of a more general nature (e.g., specifications to make elevators accessible to those with visual disabilities) are found elsewhere in ADAAG.

runs counter to the evidence before the agency, or [4] [has offered an explanation] so implausible that it could not be ascribed to a difference in view or product of agency expertise." *United States v. Snoring Relief Labs, Inc.* 210 F.3d 1081, 1085 (9th Cir. 2000) (internal quotation marks omitted, bracketed numbers added).

There is no evidence that DOT considered impermissible factors. The regulations demonstrate that DOT did not entirely fail to consider the needs of those with visual disabilities. Nor is there any reason to think that the overall set of regulations runs counter to the evidence or is implausible.

### B

Nor did DOT act arbitrarily and capriciously by failing to consider the needs of those persons with severe vision impairments who require information regarding the accessible route.[8] The Board had considered, but rejected, requiring duplicate tactile signs where there were visual signs because it would require station managers to keep two different sets of signs. 56 Fed Reg. 45,500, 45,505 (Sept. 6, 1991).[9] Likewise, DOT regulations do not require duplicate tactile signs. However, DOT does provide for some directional assistance for people with visual disabilities in its rules on signage. We cannot conclude that DOT completely failed to consider an important part of the task before it.

---

[8]It is unclear from the record whether the transit riders would use the accessible routes even if directional information were made available. Because we conclude that the regulations are not arbitrary and capricious, we need not remand to the district court for factfinding.

[9]The Board voted that "[n]o provision has been added to address the needs of persons with severe vision impairments who require directional information regarding the accessible route because the Board has very little information to adequately address the wayfinding needs of such persons at this time." *Id.*

There was no evidence before DOT which compelled a different conclusion. Nor is there any evidence that it considered impermissible factors. *See City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof . . . . Indeed, even assuming the [agency] made missteps . . . the burden is on petitioners to demonstrate that the [agency's] ultimate conclusions are unreasonable.") (internal punctuation and citations omitted).

## C

In defense of the district court decision, the transit riders cite *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). There, the Supreme Court held that the revocation of certain automobile safety regulations was arbitrary and capricious. However, the *Motor Vehicle* court expressly stated that there was a significant difference between declining to regulate in the first place and rescinding a regulation, at least where rescissions were expressly made subject to the same judicial review as issuance of regulations. *See id.* at 41 ("[N]either th[e] Act nor the APA suggests that revocations are to be treated as refusals to promulgate standards.").

Nor does *Massachusetts v. EPA*, 549 U.S. 497 (2007), demonstrate that DOT has acted in an arbitrary and capricious manner. There, the Supreme Court held that the EPA's failure to ascertain whether greenhouse gases caused climate change was arbitrary and capricious. However, in that case "[t]he harms associated with climate change [were] serious and well recognized." *Id.* at 521. The EPA simply ignored the evidence of global warming, choosing not to delve into the area because it believed that regulation would undermine the Nation's foreign policy objective of inducing "key developing nations" to reduce their greenhouse gas emissions. *Id.* at 533 (noting that such notions "have nothing to do with whether

greenhouse gas emissions contribute to climate change"). It is in this sense that the Court concluded that the EPA sought a "roving license to ignore the statutory text." *Id.*. The combined judgment of the Board and DOT about wayfinding needs, by contrast, has everything to do with their specific areas of technical expertise: evaluating technologies and accommodations for those with disabilities and transportation issues, respectively.

D

It may well be sensible to require accessible handrails, contrast striping on stairs, and other such measures to promote accessibility. However, it is not up to this court to decide what is reasonable or sensible in this regard; instead, our task is to ascertain BART's legal obligations. Unless DOT regulations are arbitrary and capricious, BART is required to do no more than follow them.

[2] DOT did not entirely ignore the needs of persons with visual disabilities. Likewise, DOT did not act arbitrarily and capriciously by entirely ignoring the wayfinding needs of those with visual disabilities, because it did consider the needs of that group. No showing has been made that the agency made regulations against the weight of the evidence before the agency or that it offered an explanation so implausible that it cannot be accepted. Therefore, the regulations cannot be held to be arbitrary and capricious on the record before us.

III

[3] BART claims that even if it violated the ADA, it is immune from liability under a safe harbor provision of 49 C.F.R. § 37.9. In support of its position, BART notes that 42 U.S.C. § 12150 provides a similar safe harbor, stating that compliance with existing federal accessibility standards in construction completed after the passage of the ADA but before DOT regulations were issued "shall suffice to satisfy

the requirement that facilities be readily accessible to and usable by persons with disabilities as required under" sections 12146 and 12147. If the facility is completed at least one year after ADAAG guidelines had been issued, but before the DOT regulations implementing them had been issued, then compliance with the ADAAG "shall be necessary to satisfy the requirement that facilities be readily accessible to and usable by persons with disabilities prior to issuance of the final regulations." *Id.* As BART correctly argues, the clear implication is that once final DOT regulations are issued, transit entities will be able to comply with the ADA by following those regulations.

Additionally, BART points to a number of cases which hold that a defendant cannot be liable for the design of a facility if it comports with the implementing regulations.[10] BART argues that these cases, which arise under Title III of the ADA and address facility design by private entities, are applicable

---

[10] *See, e.g., Sanford v. Del Taco*, 2006 WL 2669351, at *2 (E.D. Cal. Sept. 18, 2006) ("ADAAG . . . provides the standard for determining a violation of the ADA."); *Massachusetts v. E\*Trade Access, Inc.*, 2005 WL 2511059, at *4 (D. Mass. Feb. 22, 2005) ("The statutory language and structure of the ADA indicate that Congress intended that the DOJ's regulations and the ADAAG, when passed, would set forth standards sufficient to satisfy ADA obligations; the DOJ's regulations therefore establish the limits of ADA liability."); *United States v. Nat'l Amusements, Inc.*, 180 F. Supp. 2d 251, 258 (D. Mass. 2001) ("The Court infers from ADA § 306(d) that Congress intended that the Attorney General's regulations and the Access Board's guidelines, when passed, would similarly set forth the standards, which, if followed, would be sufficient to satisfy Title III obligations with respect to the design of a structure."); *see also Chapman v. Pier 1 Imports*, 2006 WL 1686511, at *7 n.11 (E.D. Cal. June 19, 2006) ("[Because of ADAAG, t]he court is not authorized to evaluate Title III disability discrimination claims under any other standard, and to determine what engineering or architectural modifications are necessary, or whether such modifications would be feasible and desirable."); *Eiden v. Home Depot USA, Inc.*, 2006 WL 1490418, *8 (E.D. Cal. May 26, 2006) ("This language also plainly implies that compliance with the ADAAG, and not another standard, constitutes compliance with the ADA requirements for new construction.").

because the US Department of Justice ("DOJ") has virtually the same authority in Title III as DOT has in Title II and both sets of regulations incorporate ADAAG. The transit riders have not provided a cogent explanation as to why the court should not consider Title III cases where both titles rely on ADAAG. On the contrary, BART has identified a very clear policy rationale supporting its position:

> The interpretation of the ADA proposed by . . . [the transit riders] is very problematic. It would allow any person to file an action contending that, in the opinion of this particular plaintiff, a design feature ought to have been included in . . . [a] structure. The courts are ill-equipped to evaluate such claims and to make what amount to engineering, architectural, and policy determinations as to whether a particular design feature is feasible and desirable . . . . It also would be difficult for anyone to design a . . . structure if the design requirements are subject to being changed retroactively.

*Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 746 (D. Or. 1997).

**[4]** BART notes that those who find the ADAAG guidelines or DOT regulations unreasonable may challenge them under the Administrative Procedure Act ("APA") (codified as amended in scattered sections of 5 U.S.C.). The transit riders, BART argues, "should not be permitted to use the courts . . . to enact regulations they failed to convince the . . . Board or the DOT to implement and did not thereafter challenge under the APA." We agree.

The transit riders respond by claiming that the safe harbor does not apply to claims that BART does not operate its facilities in an appropriate manner under 42 U.S.C. § 12148 (prohibiting operating service in a discriminatory manner). They also claim that general non-discrimination language in 42

U.S.C. § 12132 (prohibiting public entities from denying the benefit of services, programs, and activities on the basis of disability) is applicable here, and can be used to find BART liable in a way that does not implicate the safe harbor.[11]

If Congress intended that transit agencies could rely on DOT regulations in the design of their facilities, it defies logic that the transit agencies' protection could be taken away merely by citing a section of the ADA dealing with operations or one establishing a general non-discrimination rule. That would make Congress' enactment of section 12150 without any effect, because it would offer no protection at all to transit agencies which followed the rules. It seems unlikely that Congress intended that part of the ADA would be given no effect. *Cf. Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (internal citation omitted)). Likewise, the DOT regulatory safe harbor would be completely lacking if any facilities-based claim could be recast as a claim about operations, general discrimination, or another non-design related problem. Unless the issuance of § 37.9 was arbitrary and capricious, the transit riders' argument against the safe harbor must fail. And given that the safe harbor in § 37.9 closely tracks the interim safe harbors Congress provided for, it can hardly be arbitrary and capricious.[12]

---

[11]In their brief, the transit riders also suggest that despite BART's compliance with the DOT regulations, it may be held liable based on other theories. They assert that BART discriminates in favor of some groups of the disabled and against those with visual disabilities. Furthermore, they argue that BART is in violation of certain DOJ regulations. These claims cannot breach the safe harbor for the same reasons that the operation and general discrimination claims cannot.

[12]The transit riders repeatedly assert that the Board has not acted since 1991, despite having ample time to conduct further research concerning wayfinding assistance. They allege that, notwithstanding the Board's lack of action, the failure of DOT to formulate new regulations in a reasonable amount of time renders the safe harbor arbitrary and capricious.

IV

**[5]** The parties dispute whether the district court found BART in violation of California Civil Code section 54.1, which guarantees "full and equal access" to modes of transportation for those with disabilities.[13] However:

> "Full and equal access," for purposes of this section in its application to transportation, means access that meets the standards of Titles II and III of the [ADA] and federal regulations adopted pursuant thereto, except that, if the laws of [California] prescribe higher standards, it shall mean access that meets those higher standards.

Cal. Civ. Code § 54.1(a)(3). If the district court did in fact rule on the section 54.1 claim, its decision is inconsistent with our decision today. We must, therefore, vacate the district court's ruling insofar as it states that BART is liable under § 54.1 due to its noncompliance with the ADA. The transit riders may, of course, argue on remand that a higher state standard affords them relief under the statute.

---

However, the Board and DOT have not failed to act. The revised version of the ADAAG (published in 2004 and later implemented by DOT) does recommend contrast striping on stairs, though it does not require it. 36 C.F.R. § 1191 (App. D, § 504.4). It is notable that after further consideration, the Board chose to *recommend* — not to require — contrast striping. At heart, the transit riders' claim is that the Board has unreasonably delayed enacting the reforms they favor. They, however, have the burden of showing that the decision not to require contrast striping or other specific wayfinding accommodations was against the weight of the evidence before the agency. They have failed to do so.

[13]The district court did state that BART had violated section 54.1, but apparently predicated that statement on BART's violation of DOJ regulations which it later held to be inapplicable to BART. There was no mention of section 54.1 in the order granting the transit riders' cross-motion for summary judgment in 2007.

V

**[6]** Consideration of the transit riders' claims that are not based on the ADA shall be for the district court on remand.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.** Appellants are awarded costs.